SCANNED at BCF and Emailed on

___10/25/23___ by _PM_ - _34_ pages.
(date)    (initials)    (num)

# IN THE

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF INDIANA

CLARENCE A. MARTIN, JR.,

D.O.C.#984929,

    Plaintiff,

    v.                                    CAUSE NO. 3:23-cv-00176-RLY-CSW

J. Noble, Captain,

M. Poehlein, Sergeant,

Diane Pfeiffer, Grievance Specialist,

N. Lagenour, Deputy Warden, are being sued their individual capacities;

    Defendants.

**FILED**
**10/25/2023**
U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Roger A.G. Sharpe, Clerk

    JURY TRIAL DEMAND

## VERIFIED COMPLAINT FOR DAMAGES

## AND INJUNCTIVE RELIEF

### I.

### Introduction

1. This is a §1983 action filed by Plaintiff Clarence A. Martin Jr., a state prisoner, alleging violation of his First, Fifth, Eighth, and Fourteenth Amendment rights as guaranteed him by the United States Constitution and seeking injunctive relief and money damages.

1

II.

Jurisdiction

2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 in that this case is a civil action arising under the Constitution of the United States.
3. Jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1343(a)(3) in that this action seeks to redress the deprivation, under color of state law, of rights secured by Acts of Congress providing for equal rights of persons within the jurisdiction of the United States.

III.

Parties

4. Plaintiff Clarence A. Martin, Jr.,(Plaintiff) at all times relevant was confined by the Indiana Department of Corrections (IDOC) at Branchville Correctional Facility (BCF).
5. Defendant J. Noble (Cpt. Noble) at all relevant times was a Captain employed by IDOC at BCF.
6. Defendant M. Poehlein (Sgt. Poehlein) at all times relevant was a Sergeant employed by IDOC at BCF.
7. Defendant Diane Pfeiffer (Pfeiffer) at all times relevant was a Grievance Specialist employed by IDOC/BCF.
8. Defendant Nathan Lagenour (DW Lagenour) was at all times relevant a Deputy Warden employed by IDOC at BCF.
9. Defendants Cpt. Noble, Sgt. Poehlein, Pfeiffer, and DW Lagenour at all times relevant were acting under color of state law and are being sued in their individual capacities.

IV.

Exhaustion of Available Remedies

10. On December 10, 2021, Plaintiff did submit an Offender Grievance pertaining to the December 9, 2021 incident. (See copy of Offender Grievance, attached hereto and incorporated as Plaintiff's Exhibit A).
11. On December 20, 2021, Pfeiffer allowed Cpt. Noble to issue a memorandum in which Cpt. Noble either denied or downplayed the Grievance submitted by Plaintiff on December 10, 2021, and based upon Cpt. Nobles' memorandum Plaintiff's grievance was denied and signed off on by Pfeiffer as unfounded. (See Plaintiff's Exhibit A).
12. On December 30, 2021, Plaintiff did appeal the denial of his December 10, 2021 grievance by Pfeiffer. (See copy of Plaintiff's Exhibit A).

13. On January 4, 2022, DW Lagenour did deny Plaintiff's December 10, 2021 grievance, in which DW Lagenour did "concur with the formal grievance response". (See copy of Plaintiff's Exhibit A).
14. On January 4, 2022, upon receipt of DW Lagenour's denial of Plaintiff's grievance appeal, Plaintiff did forward the appeal denial to the final step of the grievance process. (See copy of Plaintiff's Exhibit A).
15. On January 5, 2022, Pfeiffer appears to have issued the response as the Final Reviewing Authority, concurring with her original denial of the grievance and alleging that the response served for the Offender Grievance Manager for the final level of review Mr. I. Randolph, and Pfeiffer did sign off on said response as the Executive Assistant on January 6, 2022. (See copy of Plaintiff's Exhibit A).

V.

Factual Statement

16. On December 9, 2021, at BCF, in C-Dorm, at approximately 8:40p.m. Plaintiff did spill water on his assigned bed (C-2-11) in cube #2, resulting in Plaintiff's bed sheet and blanket being soaked from the spill.
17. On December 9, 2021, at 8:43p.m. Plaintiff did hang the wet bed linen over the bar at the foot of Plaintiff's assigned bed/bunk.
18. At approximately 8:50p.m. Sgt. Poehlein was conducting the 9p.m. count on the north side of C-Dorm.
19. While conducting the 9p.m. count, Sgt. Poehlein did enter cube #2 and Sgt. Poehlein, who is a Caucasian male, did walk past a Caucasian inmate that had a bed sheet hanging from the top of his assigned bed, nearly to the floor, and Sgt. Poehlein did not say anything to the Caucasian inmate about the bed sheet hanging from his assigned bed.
20. After Sgt. Poehlein walked past the Caucasian inmate that had the bed sheet hanging from the top of his assigned bed, Sgt. Poehlein did approach Plaintiff, who is a African-American male, and Sgt. Poehlein did ask Plaintiff why his blanket and sheet were draped over the bar at the foot of his assigned bed, at which time Plaintiff did explain to Sgt. Poehlein that he (Plaintiff) had spilled water on his bed and as soon as the blanket and sheet were dry Plaintiff would take them down, and Sgt. Poehlein continued counting and again said nothing to the Caucasian inmate about the bed sheet hanging from his bed.
21. At approximately 9:01p.m. Cpt. Noble did enter C-Dorm through the north side doors.
22. Cpt. Noble, who is a Caucasian male, did enter cube #2, and Cpt. Noble did walk past the Caucasian inmate who had the bed sheet hanging from his assigned bed

without any mention of the bed sheet to the Caucasian inmate or any demand to remove the bed sheet.

23. After walking past the Caucasian inmate without saying anything about the bed sheet hanging from his bed, Cpt. Noble did approach Plaintiff, who is a African-American male, and began harassing him about the blanket and sheet hanging from his assigned bed.

24. Plaintiff did explain to Cpt. Noble that he (Plaintiff) did spill water on his bed and that his blanket and sheets were soaked, however, Cpt. Noble, while standing almost directly in front of the Caucasian inmates' bed that had the bed sheet hanging from it, insisted that Plaintiff take the wet blanket and bed sheet down.

25. Plaintiff did comply with Cpt. Noble and did take down the wet blanket and sheet.

26. After Plaintiff took the wet blanket and sheet down from the bed, Plaintiff did ask Cpt. Noble if he could get Plaintiff a dry and clean blanket as well as a clean, dry sheet and Cpt. Noble did respond, "Naw, we don't do that shit!", and Cpt. Noble did wave his hands at Plaintiff as if he were shewing Plaintiff off and Cpt. Noble then turned and walked back past the Caucasian inmate again without any mention about the bed sheet hanging from his assigned bed and eventually exited the north side of the dorm towards the dayroom.

27. After 9p.m. count cleared, Plaintiff did immediately proceed to the C-Dorm dayroom, where Plaintiff did observe Lieutenant Rogier (Lt. Rogier) speaking with Sgt. Poehlein and a unknown correctional officer at the C-Dorm officer station/desk.

28. Plaintiff did approach Lt. Rogier and Plaintiff did explain the situation pertaining to the wet blanket and sheet, while in the presence of Sgt. Poehlein.

29. Plaintiff did ask Lt. Rogier if he (Lt. Rogier) could get Plaintiff a clean, dry, blanket and Lt. Rogier stated, "No!" However, Lt. Rogier did give Plaintiff permission to hang the wet blanket and sheet up at the foot of his assigned bed until, either they were dry or prior to Plaintiff going to sleep.

30. Immediately after Lt. Rogier had given Plaintiff permission to hang the wet sheet and blanket up on his assigned bed in the presence of Sgt. Poehlein, Plaintiff did go to his assigned bed (C-2-11) and Plaintiff did hang the wet blanket and sheet up on the bed at 9:19p.m.

31. At approximately 9:56p.m., and after Sgt. Poehlein was present when Lt. Rogier did give Plaintiff permission to hang the wet blanket and sheet on his bed, Sgt. Poehlein did go to cube #2, and Sgt. Poehlein did walk past the Caucasian inmates bed that had a bed sheet hanging from it, without saying anything about the Caucasians sheet hanging from his bed, and Sgt. Poehlein did take Plaintiff's wet blanket and placed said wet blanket in a black garbage bag.

32. After Sgt. Poehlein placed Plaintiff's wet blanket in the black garbage trash bag, Plaintiff approached Sgt. Poehlein and stated, "You were right there when Lt. Rogier gave me permission to hang the blanket up to dry."

4

33. Following Plaintiff confronting Sgt. Poehlein about being aware that Plaintiff had permission to hang the blanket up, Plaintiff did state that he (Plaintiff) was going to file a grievance on Sgt. Poehlein.
34. Shortly after Plaintiff informed Sgt. Poehlein that he was going to file a grievance on him, Sgt. Poehlein attempted to force Plaintiff to accept an informal conduct report.
35. Plaintiff did refuse to sign the informal conduct report, and Sgt. Poehlein then threatened to retaliate against Plaintiff by writing a false conduct report alleging that Plaintiff refused a direct order.
36. Sgt. Poehlein subsequently went to the front doors of C-Dorm and Sgt. Poehlein did hand the black garbage bag containing Plaintiff's wet blanket out of the door to a Sgt. J. Henton, who walked away from C-Dorm with the black garbage bag.
37. Subsequent to Plaintiff's wet blanket being removed from C-Dorm, Plaintiff did ask Sgt. Poehlein what was going to be done about his blanket? And Sgt. Poehlein stated, "I took your blanket to teach you a lesson when I give you a direct order!"
38. At approximately 11:40p.m. Sgt. Poehlein did approach Plaintiff's assigned bed and did place a black garbage bag on Plaintiff's bed.
39. Plaintiff asked Sgt. Poehlein what was in the bag and Sgt. Poehlein stated, "Your blanket", and Plaintiff asked if it was dry? And Sgt. Poehlein responded, "No", and Sgt. Poehlein turned and walked away.
40. Plaintiff did open the bag and placed his hand in said bag, thus, feeling that the blanket inside was soaking wet and not useable at all.
41. Plaintiff did drop the bag containing the blanket on the floor at the foot of his assigned bed and attempted to bare the elements, i.e. the cold draft that seeped through the gaps of the unsealed window pain.
42. Throughout the night on December 9, 2021, Plaintiff did drift in and out of consciousness, often awakening feeling numbness in his feet and hands, as well as his teeth chattering due to the cold and having no dry blanket to combat the cold.
43. On December 10, 2021, Plaintiff did prepare and submit an Offender Grievance, grieving the racial discrimination, retaliation, and intimidation tactics inflicted upon him (Plaintiff) by Sgt. Poehlein and Cpt. Noble on December 9, 2021. (See Plaintiff's Exhibit A).
44. On December 13, 2021, Plaintiff did receive a Receipt-Administrative Remedy from Diane Pfeiffer (Pfeiffer) indicating that Plaintiff's December 10, 2021 grievance had been received by the Facility Grievance Specialist and that said grievance had been issued the Case ID number: 136277.
45. On December 14, 2021, Plaintiff did receive a callout pass for 9a.m. to see the Disciplinary Screening Officer.
46. At approximately 9:22p.m., on December 14, 2021, the Disciplinary Screening Officer (Ofc. Coomer) did read Plaintiff a Report of Conduct, authored by Sgt. Poehlein, falsely charging Plaintiff for a code 347-C violation, Refusing an Order,

5

pertaining to the December 9, 2021 incident, in retaliation for Plaintiff filing the case ID 136277 grievance. (See copy of the Notice of Disciplinary Screening Hearing, attached hereto, and incorporated as Plaintiff's Exhibit B).

47. While Ofc. Coomer was "Screening" Plaintiff, regarding the Report of Conduct, Plaintiff did request the video surveillance footage of the December 9, 2021 incident, and a witness statement from Lt. Rogier, in which Lt. Rogier stated that he did give Plaintiff permission to hang the wet blanket and bed sheet up on his assigned bed to dry. (See Plaintiff's Exhibit B).

48. On December 20, 2021, Facility Grievance Specialist Diane Pfeiffer did allow Cpt. Noble to deny Case ID #136277 grievance as unfounded, where Cpt. Noble was allowed to issue what appears to be a memorandum downplaying the complaints contained in Plaintiff's grievance, and Pfeiffer did sign off on said denial as the Grievance Specialist. (See Plaintiff's Exhibit A).

49. On December 27, 2021, Plaintiff did receive a Report of Disciplinary Hearing Video Evidence Review regarding Plaintiff's evidentiary request made on December 14, 2021 in order to mount his defense against the false conduct report written by Sgt. Poehlein concerning the December 9, 2021 events. (See copy of the Report of Conduct attached hereto and incorporated as Plaintiff's Exhibit C)(See also a copy of Report Of Disciplinary Hearing Video Evidence Review attached hereto and incorporated as Plaintiff's Exhibit D).

50. Also on December 27, 2021, Plaintiff did receive the Grievance Specialist Response from Pfeiffer dated December 21, 2021, in which Cpt. Noble was allowed to deny Plaintiff's grievance by issuing a memorandum that Pfeiffer did sign off on as the grievance specialist.

51. On December 27, 2021, continuous time, and subsequent to Plaintiff receiving the response, Plaintiff did appeal the grievance denial specifically focusing on the fact that Pfeiffer failed to indicate any investigation of the grievance claims other than allowing Cpt. Noble to issue a memorandum, and that Pfeiffer did not review the video surveillance footage that was available on December 9, 2021. (See Plaintiff's Exhibit A).

52. On December 28, 2021, a disciplinary hearing was held in regards to the false Report of Conduct that was written by Sgt. Poehlein, in which Lt. Rogier did provide a witness statement to the Disciplinary Hearing Officer that stated that he (Lt. Rogier) did give Plaintiff permission to hang the blanket up on his assigned bed on December 9, 2021, in the presence of Sgt. Poehlein, and based on said statement from Lt. Rogier, the Report of Conduct was dismissed because the statement proved Plaintiff's innocence. (See Plaintiff's Exhibit C).

53. On January 4, 2022, DW Lagenour did deny Plaintiff's Grievance Appeal, stating, "I concur with the formal grievance response". (See Plaintiff's Exhibit A).

54. On January 4, 2022, Plaintiff did receive DW Lagenour's Grievance Appeal denial, and did disagree with the response and Plaintiff did make a request to forward the

6

Grievance Appeal to the Department Grievance Manager for the final review of grievance process. (See Plaintiff's Exhibit A).

55. On January 6, 2022, Plaintiff did receive a response regarding Plaintiff's request for the Department Grievance Manager's final review.

56. The response states as follows: "Your grievance appeal and all attached documents have been reviewed" "I concur with the facility level response" "Grievance Appeal Unfounded at the facility level Mr. I. Randolph is the Final Reviewing Authority Per Offender Grievance Process 00 02 301 The above response serves for the Offender Grievance Manager for the final level of review Mr. I. Randolph. Final Reviewing Authority Offender Grievance Process 00 02 301".

57. At the bottom of the response, in the Executive Assistant space, Pfeiffer did sign off on said response dated January 6, 2022, indicating that she, not Mr. I. Randolph, did act as both the formal grievance reviewing authority, as well as the Final Reviewing Authority/Department Grievance Manager. (See Plaintiff's Exhibit A).

## Claims for Relief

### A. Racial Discrimination

58. Sgt. Poehlein's failure to treat the similarly situated Caucasian inmate who had a bed sheet hanging from his assigned bed in the same manner that Plaintiff had the wet blanket and sheet hanging from his assigned bed did violate Plaintiff's Fourteenth Amendment right to the United States Constitution to be free from being discriminated against based upon race.

59. Cpt. Noble's failure to treat the similarly situated Caucasian inmate who had a bed sheet hanging from his assigned bed in the same manner that Plaintiff had the wet blanket and sheet hanging from his assigned bed did violate Plaintiff's Fourteenth Amendment right of the United States Constitution to be free from being discriminated against based upon race.

### B. Cruel and Unusual Punishment

60. Sgt. Poehlein's erroneous confiscation of Plaintiff's blanket and bed sheet, during a cold December night, along with Sgt. Poehlein's refusal to provide Plaintiff clean dry bed linen after requested by Plaintiff, thus, forcing Plaintiff to sleep without bed linen and to bare the elements, i.e., his hands and feet becoming numb and his teeth chattering, due to his inability to be able to capture any warmth by wrapping up in a

clean, dry blanket did violate Plaintiff's Eighth Amendment right to the United States Constitution to be free from cruel and unusual punishment.

### C. Retaliation

61. Sgt. Poehlein did retaliate against Plaintiff after Plaintiff did inform Sgt. Poehlein that if he did not replace Plaintiff's erroneously confiscated blanket with a clean, dry blanket that he would file a grievance on him, where afterwards, Sgt. Poehlein did write a false conduct report alleging that Plaintiff refused a direct order, in violation of Plaintiff's First Amendment right to the United States Constitution to be free to exercise his freedom of speech without being retaliated against.

### D. Civil Conspiracy

62. Cpt. Noble did conspire with Diane Pfeiffer and Nathan Lagenour to deprive Plaintiff of his Fourteenth Amendment right to the United Constitution to be free from racial discrimination, where Cpt. Noble did act in concert with Pfeiffer, using Pfeiffer's position as grievance specialist to cover up the racial discrimination that was inflicted upon Plaintiff by both Cpt. Noble and Sgt. Poehlein, by prejudicially denying Plaintiff's grievance as unfounded without investigating Plaintiff's claims, i.e., by failing to review the video surveillance footage of the incident in question, which shows both Cpt. Noble and Sgt. Poehlein walk past a Caucasian inmate who had bed linen hanging from his assigned bed in a similar manner that Plaintiff, who is an African-American male, had his wet blanket and sheet hanging on his assigned bed to dry, and neither Cpt. Noble or Sgt. Poehlein said anything to the Caucasian inmate about his bed sheet hanging from his assigned bed.
63. Pfeiffer did conspire with Cpt. Noble and DW Lagenour to deprive Plaintiff of his Fourteenth Amendment right to the United States Constitution to be free from racial discrimination, where Pfeiffer did act in concert with Cpt. Noble, acting as the Facility Grievance Specialist and allowing Cpt. Noble to unequivocally deny Plaintiff's grievance as unfounded and Pfeiffer did sign off on said unfounded denial as "Grievance Specialist".
64. DW Lagenour did conspire with Diane Pfeiffer and Cpt. Noble to deprive Plaintiff of his Fourteenth Amendment right to the United States Constitution to be free from racial discrimination, where DW Lagenour did act in concert with both Diane Pfeiffer

and Cpt. Noble by attempting to cover up the racial discrimination that was inflicted upon Plaintiff by Sgt. Poehlein and Cpt. Noble, where DW Lagenour did openly admit that he (DW Lagenour) did "concur" with the actions taken by both Pfeiffer and Cpt. Noble at the formal grievance response, and DW Lagenour did deny Plaintiff's grievance appeal at the Warden's Appeal Response.

## Relief Requested

WHEREFORE, Plaintiff requests that this Court grant the following relief:

A. Declare that Defendant Sgt. Poehlein did violate Plaintiff's Fourteenth Amendment rights when he failed to equally apply the prison policy/rule to the Caucasian inmate in the same manner as he applied the prison policy/rule to Plaintiff, i.e., confiscating Plaintiff's blanket and writing a false conduct report on Plaintiff for refusing a direct order, and not applying these tactics to the Caucasian inmate who was similarly situated.

B. Declare that Defendant Cpt. Noble did violate Plaintiff's Fourteenth Amendment rights when he failed to equally apply the prison policy/rule to the Caucasian inmate in the same manner as he applied the prison policy/rule to Plaintiff, i.e., not demanding that the Caucasian inmate take down his bed sheet that was hanging from the Caucasian inmate's assigned bed in a similar manner in which Plaintiff had his wet bed linen hanging from his assigned bed.

C. Declare that Defendant Sgt. Poehlein did violate Plaintiff's First, Fifth, and Eighth Amendment rights when Sgt. Poehlein retaliated against Plaintiff after Plaintiff informed Sgt. Poehlein that Plaintiff was going to file a grievance on Sgt. Poehlein after Sgt. Poehlein maliciously confiscated Plaintiff's blanket and refused to provide Plaintiff with clean dry bed linen, thus forcing Plaintiff to suffer throughout a cold winter night by having to sleep without a dry blanket/minimal necessities to combat the cold, leaving Plaintiff to experience numbness in his hands and feet and causing Plaintiff's teeth to chatter as well as causing Plaintiff to fear what BCF staff is capable of because of their total disregard for both law and policy as well as Plaintiff's health and safety.

D. Declare that Defendant Pfeiffer did violate Plaintiff's First, Fifth, Eighth, and Fourteenth Amendment rights when Defendant Pfeiffer did conspire with Cpt. Noble and DW Lagenour to cover up the racial discrimination, retaliation, and cruel and unusual punishment that was inflicted upon Plaintiff by Sgt. Poehlein and Cpt. Noble, where Defendant Pfeiffer did allow Cpt. Noble to use her position as the Facility Grievance Specialist to cover up and deny Plaintiff's grievance pertaining to the racial discrimination, cruel and unusual punishment, and retaliation that was inflicted upon Plaintiff by Sgt. Poehlein and Cpt. Noble.

9

E. Declare that Defendant Cpt. Noble did violate Plaintiff's First, Fifth, Eighth and Fourteenth Amendment rights when Cpt. Noble did conspire with Defendant Pfeiffer, using her position as the Facility Grievance Specialist to cover up and deny Plaintiff's grievance pertaining to the racial discrimination, retaliation, and cruel and unusual punishment that was inflicted upon Plaintiff by Sgt. Poehlein and Cpt. Noble.

F. Issue an injunction for a Temporary Restraining Order requiring that Plaintiff be transferred to another level 2 facility to avoid any further retaliation, racial discrimination, cruel and unusual punishment, and/civil conspiracies to be inflicted upon Plaintiff by BCF staff;

G. Award compensatory damages for Plaintiff's physical and emotional injuries in the amount of $10,000 against each defendant named in this complaint as well as award punitive damages against each defendant named in this complaint; and

H. Grant Plaintiff such other relief as it may appear Plaintiff is entitled to.

*CLARENCE A. MARTIN, JR. #984929*

*BRANCHVILLE CORRECTIONAL FACILITY*

*21390 OLD STATE ROAD 37*

*BRANCHVILLE, IN 47514*